IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT YOHO, | ) | CASE NO. 4:25-cv-02737-RJS |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| v. | ) | |
| | ) | |
| COMMISSIONER OF | ) | **MEMORANDUM OPINION AND** |
| SOCIAL SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

## I. Introduction

Plaintiff, Robert Yoho ("Yoho") seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and on consent of the parties. Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Yoho's applications for DIB and SSI is affirmed.

## II. Procedural History

Yoho filed for DIB and SSI on December 13, 2022, alleging a disability onset date of September 30, 2022. (Tr. 669-76). The claims were denied initially and on reconsideration. (Tr. 480-503, 505-27). He then requested a hearing before an ALJ. (Tr. 550-51). Yoho (represented by counsel) and a vocational expert ("VE") testified before the ALJ on February 12, 2025. (Tr.

185-208). On March 4, 2025, the ALJ issued a written decision finding Yoho not disabled. (Tr. 159-84). The Appeals Council denied Yoho's request for review on October 29, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Yoho timely filed this action on December 17, 2025. (ECF Doc. 1).

## III. Evidence

### A. Personal, Educational, and Vocational Evidence

Yoho was 42 years old on the alleged onset date, making him a younger individual according to Agency regulations. (*See* Tr. 175). He graduated from high school. (*See id.*). In the past, he worked in general hardware sales. (*Id.*).

### B. Relevant Medical Evidence

On November 30, 2022, Yoho met with Joseph Miladore, M.D., for follow up after undergoing pulmonary function testing, cardiac stress test, echocardiogram, and Holter monitor. (Tr. 994). Examination results were unremarkable. (Tr. 996). Imaging revealed a 4.8 cm aortic aneurysm at the aortic root and a 4.2 cm aortic aneurysm at the mid thoracic level; pulmonary function testing showed evidence of mild obstructive pulmonary disease with bronchodilator response. (*Id.*). There were incidental findings of hepatomegaly and a 1 cm thyroid nodule; additional testing was ordered and further follow up recommended. (Tr. 997). Dr. Miladore diagnosed Yoho with asthma and started him on albuterol sulfate and Flovent, and started him on 500 mg metformin extended release for his prediabetes. (Tr. 996-97).

A December 2 thyroid ultrasound revealed a 6-mm right mid-pole cyst with a small mural nodule, categorized TR3, mildly suspicious, and recommended biopsy. (Tr. 1035-36).

On December 7, 2022, Yoho met with Aaron Smith, CRNP, for new patient aortic assessment, reporting new dyspnea on exertion and difficulty controlling his hypertension. (Tr. 943-44). Testing before the appointment included a transthoracic echocardiogram and CTA of the chest, which revealed a 4.8 cm ascending aortic aneurysm. (Tr. 946; 992-93). On examination, his blood pressure was 142/103, but he had clear lungs, no murmur, or edema, and normal strength. (Tr. 945-46). Surgical repair was not yet indicated. (Tr. 946). CRNP Smith recommended he maintain blood pressure at or below 130/80 and avoid frequent heavy lifting of more than 50 pounds. (Tr. 946-47). CRNP Smith referred Yoho for advanced hypertension management and recommended follow up in six months for further CTA imaging. (Tr. 947).

Yoho met with cardiologist Lindsay Mehring, D.O., on December 9, 2022 for a new patient consult. (Tr. 937). He reported having sporadic sharp, stabbing pain under his left breast, and consistently elevated blood pressure readings at home. (Tr. 937-38). On examination, his blood pressure was 130/80 and pulse 74, with normal rate, regular rhythm, and no murmurs. (Tr. 939-40). Dr. Mehring noted Yoho was taking carvedilol 12.5 mg twice daily, amlodipine/Olmesartan 10/40 mg daily, and indapamide 1.25 mg daily for hypertension. (Tr. 941). Dr. Mehring established a blood-pressure goal of below 120/80 and pulse near 60 and recommended sodium restriction, aerobic exercise, and avoidance of heavy weightlifting and high-intensity interval training. (Tr. 941-42).

On December 27, 2022, x-rays of the bilateral knees showed preserved compartments without fracture, dislocation, effusion, spurring, and no significant osteoarthritic changes. (Tr. 842).

On January 12, 2023, Yoho met with cardiologist Saberio Lo Presti Vega, M.D., for a second opinion concerning his bicuspid aortic valve with associated aortopathy. (Tr. 910-19; *see*

*also* 1114-19). He reported shortness of breath, fatigue, chest pressure, lightheadedness, dizziness, and bilateral lower extremity edema, starting after his husband passed away from cancer in October 2022. (Tr. 1114-15). On examination, his blood pressure was 135/79, pulse 67, he had clear lungs, regular cardiovascular rhythm without murmur, no edema, and a coordinated gait. (Tr. 1117). Dr. Lo Presti Vega recommended continuing blood pressure control measures with a goal of <130/80; lifestyle modifications and weight-lifting restrictions; and ordered genetic consult, with a recommendation to follow up in two weeks. (Tr. 1118).

On January 16, 2023, Yoho followed up with Dr. Miladore. (Tr. 1556). Examination results were all within normal limits. (Tr. 1558-59). Dr. Miladore noted that Yoho had followed up with multiple consultants regarding his ascending thoracic aneurysm, and been diagnosed with congenital insufficiency of aortic valve. (Tr. 1557, 1560). Dr. Miladore prohibited lifting more than 25 pounds because Yoho was at "significant risk for aneurysmal rupture and potential death." (Tr. 1557). Dr. Miladore noted that Yoho required repeat imaging of his heart every 6-12 months, and that cardiology was concerned that he would develop aortic valve regurgitation secondary to his bicuspid aortic valve. (Tr. 1559). Prior pulmonary function testing showed evidence of mild obstructive disease, reversible with the bronchodilator; Yoho reported his shortness of breath had improved with the Flovent inhaler. (Tr. 1557, 1560). Earlier biopsy of the thyroid nodule was benign; Dr. Miladore recommended repeat TSH testing and thyroid ultrasound every six months. (Tr. 1561).

On January 26, 2023, Yoho again followed up with Dr. Miladore, who confirmed the earlier lifting prohibition, specialist recommendations, and test results. (Tr. 1008-13). Dr. Miladore noted that his shortness of breath could have dual etiologies of asthma versus thoracic ascending aortic aneurysm. (Tr. 1012). He added that further evaluation of the cause of hand

discoloration when he raises it above his head, evaluation of his Protonix, and orders for MRIs and MRAs were necessary. (*Id.*).

Also on January 26, 2023, Yoho followed up with Dr. Lo Presti Vega. (Tr. 1108). Yoho denied syncope and lower extremity edema but continued to have shortness of breath on exertion and episodes of chest fluttering at night, associated with an elevated heart rate of 130 bpm. (*Id.*). Dr. Lo Presti Vega noted that Yoho's echocardiogram demonstrated normal biventricular function; CTA was remarkable for a dilated aortic root with asymmetric sinuses up to 4.5 cm and a dilated mid-ascending segment at 4.8 cm; CT images were consistent with a small fixed perfusion defect in the septum. (Tr. 1111-12). Dr. Lo Presti Vega ordered repeat CTA of the chest, abdomen, and pelvis in May; that Yoho obtain cardiac PET/CT; that he wear a Zio heart rate monitor for one week; and to follow up with genetics. (Tr. 1112).

Also on January 26, 2023, Yoho underwent an initial counseling evaluation with David Knickerbocker, LPCC. (Tr. 1061-64). Yoho reported significant stress due to the recent loss of his partner and his serious medical diagnoses. (Tr. 1061). Examination results were generally within normal limits, although Yoho exhibited fair insight and judgment. (Tr. 1063). LPCC Knickerbocker diagnosed Yoho with adjustment disorder with mixed anxiety and depressed mood. (*Id.*).

On January 30, 2023, Yoho met with LPCC Knickerbocker; on examination he demonstrated euthymic mood with no signs of depression or apparent signs of anxiety, and intact insight and judgment. (Tr. 1065-69). He continued to regularly meet with LPCC Knickerbocker for weekly counseling sessions. (Tr. 1071-76).

On March 9, 2023, Yoho underwent a genetic counseling consultation with Paul Crawford, LGC. (Tr. 1097). Yoho reported diagnoses including asthma, potential fatty liver

disease, benign thyroid mass, markers for COPD, bicuspid aortic valve and ascending aortic dilation, hypertension, and XX/XY chimerism. (Tr. 1097-98). Due to his reported medical and family history, LGC Crawford recommended multigene aortopathy panel testing. (Tr. 1100-01).

The same day, Yoho met with Rocio Moran, M.D., with the Medical Genetics and Connective Tissue Disorders Clinics. (Tr. 1091-97). Dr. Moran noted that Yoho had multiple minor anomalies that made it difficult to unify into a single diagnosis. (Tr. 1096). Dr. Moran recommended Yoho obtain an aortopathy panel. (*Id.*). Results for the aortopathy comprehensive panel were all negative or normal and he was recommended to continue with cardiology. (Tr. 1089).

On April 13, 2023, Yoho followed up with Dr. Miladore after experiencing upper respiratory symptoms of congestion, headache, sinus tenderness, and wheezing. (Tr. 1288-90). Dr. Miladore diagnosed Yoho with asthma exacerbation secondary to wheezing and ordered a chest x-ray for further evaluation. (Tr. 1290). Yoho was contraindicated for Augmentin and Levaquin so Dr. Miladore prescribed doxycycline 100 mg twice daily for 7 days, albuterol nebulizer every 8 hours for one week, and prednisone 5 mg daily for 5 days. (Tr. 1289-90).

Yoho again followed up with Dr. Miladore on April 19, 2023, reporting that his breathing had improved since the last office visit and denied further wheezing episodes. (Tr. 1276-77). He had been seen by cardiology, who determined that his shortness of breath and dizziness was not related to his heart condition. (Tr. 1277-78). He denied any further episodes of hypotension or tachycardia; Dr. Miladore decreased Coreg from 25 mg twice daily to 12.5 mg twice daily and continued his prior orders. (Tr. 1277-80).

On June 28, 2023, Yoho met with cardiothoracic surgeon Maureen Cheung, D.O. and reviewed recent imaging and cardiac studies, including coronary and chest CTAs, angiogram,

nuclear PET stress testing, cardiac MRI, echocardiogram. (Tr. 1420-28). Dr. Cheung noted that Yoho's bicuspid aortic valve appeared to be functioning well with minimal insufficiency and no stenosis. (Tr. 1420). Cardiac MRI in April 2023 showed anomalous anterior takeoff of the right coronary artery from the left coronary cusp, but no infiltrative myocardial process; CTA and echocardiogram results were similar to those taken in November 2022. (Tr. 1421-22). Yoho reported that his blood pressure was difficult to control, but it appeared to be improving with therapy and that he had recently been diagnosed with type II diabetes and had lost 30 pounds. (Tr. 1420-21). Dr. Cheung ordered a sleep study to confirm sleep apnea and a gated CTA coronary study to delineate his anatomy and rule out a malignant right coronary artery. (Tr. 1421).

On May 4, 2023, Yoho presented to the emergency department complaining of intermittent left-sided chest pain with mild shortness of breath. (Tr. 2022). ECG was normal, serial troponins were negative, BNP was 4 pg/mL, potassium was 3.4 mEq/L, and WBC was 11.8 K/uL. (Tr. 2025). He was stabilized in the ER and was discharged with instruction to follow up with his cardiologist. (Tr. 2025-29). On May 9, 2023, Yoho followed up with Dr. Miladore for assessment of his shortness of breath. (Tr. 1490-98). Dr. Miladore noted that his cardiac abnormalities could be a contributing factor in combination with low blood pressure, dizziness, and lightheadedness; panic attacks were also a possibility. (Tr. 1493). Dr. Miladore was unsure of the underlying factor for Yoho's breathlessness and placed a referral to pulmonology for further recommendations. (*Id.*).

On August 9, 2023, Yoho followed up with Dr. Cheung via telehealth after obtaining a CTA coronary study. (Tr. 1434). Dr. Cheung noted the ascending aorta appeared to be stable; his coronary course appeared to be a normal variant of bicuspid with no intra-aortic course and no

coronary disease; he currently had only mild insufficiency. (Tr. 1435). Dr. Cheung recommended a 6-month CTA aneurysm study and that Yoho continue to follow with her and with Dr. Rea to monitor his aortic valve. (*Id.*).

On September 27, 2023, Dr. Miladore ordered an MRI of Yoho's brain due to symptoms and signs involving his nervous system. (Tr. 1448). Results showed multiple small foci at T2, prolongation seen of the white matter, most pronounced within the subcortical regions. (*Id.*). There was no evidence of acute infarction or intracranial abnormality. (*Id.*).

On October 11, 2023, Yoho met with neurologist Asma Moussanoui, M.D., after an abnormal brain MRI. (Tr. 1611-13). Yoho reported trouble with his short-term memory; severe cramps in his legs, improved by amlodipine; changing color in his arms when raised; pain in his bilateral extremities where he gets cold and hot; and dizzy spells if he suddenly stands up. (Tr. 1613). On examination, Yoho exhibited no obvious deficits or limitations. (Tr. 1613). Dr. Moussanoui believed that the abnormal MRI results were most likely microvascular changes with no clinical significance, but ordered CTs of the neck and head, and an additional brain MRI to confirm. (Tr. 1613-14).

On November 15, 2023, Yoho treated with Joshua J. Natali, D.O., for bilateral knee pain, right greater than left, recently more consistently painful. (Tr. 1590-93). Previous x-rays from 2022 demonstrated good alignment of the right knee. (Tr. 1592). There was questionable defect of the lateral tibial plateau, difficult to discern on imaging. (Tr. 1592-93). Dr. Natali diagnosed Yoho with primary osteoarthritis in his right knee and provided a Kenalog and lidocaine injection, which Yoho tolerated well. (Tr. 1593).

On November 21, 2023, Yoho underwent a biopsychosocial assessment with Taylor Watson, Psych-CNP, reporting that he had been experiencing daily symptoms of anxiety and

depression since his partner had died of cancer the year before. (Tr. 2079-89). Yoho reported that he had previously attended counseling but stopped due to insurance issues; he denied a history of taking psychotropic medication. (Tr. 2079). CNP Watson diagnosed Yoho with generalized anxiety disorder; major depressive disorder, recurrent, moderate; and bereavement uncomplicated. (Tr. 2088-89). CNP Watson started Yoho on mirtazapine 7.5 mg nightly, with a recommendation to follow up in one month. (Tr. 2089).

On December 19, 2023, Yoho met with CNP Watson, reporting that he had not noticed any change since starting mirtazapine, continued poor sleep, good appetite, and mood and anxiety of 6/10. (Tr. 2090). He had counseling scheduled to start the following month. (*Id.*). CNP Watson increased mirtazapine to 15 mg nightly and hydroxyzine 50 mg as needed for anxiety. (Tr. 2092).

On December 27, 2023, Yoho had a vascular surgery outpatient consultation with Drazen Petrinec, M.D., for evaluation of possible thoracic outlet syndrome. (Tr. 1648). Yoho reported symptoms including very poor short-term memory and haze in his thinking, along with numbness, weakness, and swelling in his bilateral upper and lower extremities. (Tr. 1648, 1651). Adson's maneuver was negative in both arms. (Tr. 1652-53). Dr. Petrinec could not place all of Yoho's symptoms into one diagnostic category; he recommended venogram, cervical spine x-rays, and an EMG nerve conduction study for further workup. (Tr. 1653). Dr. Petrinec also recommended evaluation for possible Ehlers-Danlos syndrome due to the laxity of his tissues and family history. (*Id.*).

A January 5, 2024 nerve conduction study with EMG was abnormal, with evidence of mild carpal tunnel syndrome on the left; no abnormalities on the right. (Tr. 1662-63).

On January 15, 2024, Yoho met with Bradford Diemer, LPCC for counseling, reporting that his anxiety- and depression-related symptoms were unchanged. (Tr. 2094). LPCC Diemer recommended Yoho meet once monthly to learn coping skills to decrease symptoms of anxiety and depression. (Tr. 2095-96).

On January 16, 2024, Yoho met with CNP Watson, reporting that his medications were partially effective at improving his symptoms and that he had some short-term benefit, but his ongoing health issues contributed to his stress. (Tr. 2098). CNP Watson continued him on mirtazapine 15 mg nightly; hydroxyzine 50 mg as needed; and started him on Zoloft 25 mg daily for depression and anxiety. (Tr. 2100).

During a February 13, 2024 appointment with CNP Watson, Yoho reported some improvement with depressive symptoms. (Tr. 2118). CNP Watson increased Zoloft to 50 mg and continued his other medications. (Tr. 2120). On March 12, 2024, Yoho met with CNP Watson. (Tr. 2126). He reported continued grief and horrible anxiety, and that he almost had a panic attack but was able to use coping skills to talk himself down. (*Id.*). CNP Watson stopped mirtazapine; continued Zoloft 50 mg daily and hydroxyzine 50 mg as needed; started buspirone 7.5 mg twice daily; and started trazodone 50 mg as needed. (Tr. 2128).

On March 18, 2024, Yoho underwent evaluation by Justin Abbatemarco, M.D. for a second opinion on the microvascular changes found on the MRI. (Tr. 2425). Yoho reported symptoms including weakness of his grip strength; dropping items frequently; sensory changes in his hands without relief from splint use; brain fog and memory impairment; difficulty multitasking; temperature changes; lightheadedness but no syncopal episodes; insomnia; frequent sinus infection; and instability, especially on uneven ground. (Tr. 2425-26). On examination, Yoho exhibited 5/5 strength in all extremities; positive reflexes; normal

coordination and touch; normal Romberg's test, and diminished pin prick on the left. (Tr. 2427-28). He was able to rise from the chair independently; his gait was slightly unsteady, but he was able to heel, toe, and tandem walk. (Tr. 2428). Dr. Abbatemarco noted a pending connective tissue/hypermobility evaluation. (Tr. 2430). He believed multiple sclerosis was not likely and Yoho's symptoms were instead multifactorial in nature. (*Id.*). He recommended consult with physical and occupational therapy and that he should consider carpal tunnel release surgery. (*Id.*).

On March 19, 2024, Yoho met with Joseph DiDomenico, D.C., F.A.C.O., of the Ohio Sports and Spine Institute reporting neck pain, and left upper extremity numbness and tingling. (Tr. 1692-97). Yoho reported paresthesias in the left C8/ulnar distribution, but Dr. DiDomenico was unable to reproduce with provocative maneuvers. (Tr. 1697). Dr. DiDomenico found Yoho demonstrated significant hypermobility and poor stability motor control; he recommended physical therapy two to three times weekly for four weeks before reevaluating. (*Id.*). Yoho was assessed by physical therapy on March 19, 2024, and reported having 7/10 pain. (Tr. 1698). After evaluation, he was recommended to have physical therapy twice weekly for four weeks. (Tr. 1698-1702). He attended physical therapy sessions on March 26, March 28, April 2, April 4, April 9, April 11, and April 18, 2024. (Tr. 1704-46). At the end of the physical therapy sessions, Yoho reported his pain at 2/10. (Tr. 1743).

On April 18, 2024, Yoho underwent a reexamination by Dr. DiDomenico, who noted significant improvement overall after starting physical therapy and chiropractic treatment. (Tr. 1753). Yoho reported a flare up and increased pain due to barometric changes and having to drive long distances for doctor's appointments. (*Id.*). Dr. DiDomenico recommended continuing

with physical therapy to benefit his stability and motor control, and to utilize spinal manipulation on an as-needed basis combined with a home exercise program. (Tr. 1758).

On May 20, 2024, Yoho attended an appointment with Yazid Alrajeh, M.D., for evaluation of thoracic outlet syndrome. (Tr. 2052). He reported numbness and tingling in his hands bilaterally, as well as cramping in his thighs. (*Id.*). Dr. Alrajeh noted that there was no evidence of multiple sclerosis, demyelination disease, cervical radiculopathy, brachial plexopathy, or neurogenic thoracic outlet syndrome. (*Id.*). Prior EMG had revealed left median neuropathy. (*Id.*). Dr. Alrajeh noted decreased sensation at the left side of the face, including decreased vibration, but full strength throughout. (Tr. 2056, 2058). Dr. Alrajeh ordered a neuromuscular ultrasound of the upper extremities and recommended follow up in three months. (Tr. 2058).

On June 13, 2024, Yoho met with Dr. Miladore for follow up and noted that his cardiologist had increased carvedilol from 12.5 mg to 25 mg twice daily. (Tr. 2204-06). Dr. Miladore noted that Yoho would require a liver and thyroid ultrasound in September 2024 for the colloid nodule; that he had a pending echocardiogram per cardio; a pending brain scan per neuro; and that he would require CTA aneurysm monitoring every year; and ordered x-ray of neck and back to evaluate for scoliosis. (Tr. 2213). He stopped metformin and recommended bloodwork in 6 months, including TSH and HbA1c. (*Id.*).

On July 5, 2024, Yoho met with Alexander Masters, NP, for a GI office visit to evaluate irritable bowel syndrome. (Tr. 2192). NP Masters recommended Yoho stop Miralax, Senokot, and take Linzess 145 mcg daily for control of his bowel symptoms, with a repeat ultrasound in six months. (Tr. 2197).

### C. Medical Opinion Evidence

#### 1. State Agency Reviewers

On June 20, 2023, at the initial level, state agency reviewing psychologist Kristen Haskins, PsyD, opined that Yoho retained the capacity to carry out one- to three-step instructions in a work environment with no fast paced demand where he can work away from the distractions of others; he could interact with coworkers and supervisors in a small, non-public group setting on an occasional basis superficially for work-related tasks only; no over-the-shoulder supervisor scrutiny; he can adjust to minor changes in the work setting and still complete an ordinary routine consistently on an independent basis; major changes would need to be introduced in advance and then gradually phased in to allow him time to adjust to the new expectations. (Tr. 489-90; 501-02).

On July 24, 2023, at the initial level, state agency reviewing physician King Leong, M.D., opined that Yoho had the capacity to work at a light exertional level, with only occasional climbing of ladders/ropes/scaffolds and frequent climbing of ramps/stairs; and must avoid even moderate exposure to hazards such as machinery, unprotected heights, open bodies of water, and fumes, odors, dusts, gases, and poor ventilation. (Tr. 486-87; 498-99).

On November 13, 2023, at the reconsideration level, Leslie Green, M.D. did not affirm the prior agency medical findings, because there was new and material evidence that Yoho was working full-time at Lowe's during the initial evaluation period, and there was insufficient evidence to make redetermination findings. (Tr. 505-22). State agency reviewing psychologist Aracelis Rivera Castro, PsyD, made the same findings on November 17, 2023. (*Id.*).

### 2. Consultative Examiners

On May 15, 2023, Yoho underwent a psychological evaluation performed by J. Joseph Konieczny, Ph.D. (Tr. 1386-88). Dr. Konieczny assessed Yoho as having major depressive disorder, recurrent, moderate, with anxious distress. (Tr. 1388). He opined Yoho had no obvious limitations in his ability to understand, remember, and carry out instructions; that he would have difficulty maintaining focus and persistence on moderate-to-complex multi-step tasks; that he would have diminished tolerance for frustration and diminished coping skills impacting his ability to respond to typical supervision and interpersonal situations, and in his ability to respond to typical pressure situations at work. (*Id.*). Dr. Konieczny also noted that Yoho participated in routine responsibilities at home to the extent he perceived he was physically capable, and could manage his own benefits. (*Id.*). However, he opined Yoho's overall level of functioning was at a reduced level of efficiency reflective of his mood symptoms. (*Id.*).

### 3. Treating Providers

On October 6, 2023, LPCC Knickerbocker submitted a letter stating that Yoho had not been under his care for some weeks. (Tr. 1579). However, at that time, and as to Yoho's mental health only, his depression and anxiety had improved but were in direct connection with his many physical problems and would likely continue until there was some resolution of his physical health. (Tr. 1579).

On April 24, 2024, CNP Watson completed a mental residual functional capacity questionnaire. (Tr. 1675-80). CNP Watson noted that Yoho had monthly appointments with her since November 21, 2023 and received medication management in combination with therapy services. (Tr. 1675). Yoho reported ongoing symptoms of depression and anxiety and grief that impacted his ability to complete day-to-day tasks. (*Id.*). In CNP Watson's opinion, Yoho had

limited but satisfactory capacity to work in all areas. (Tr. 1677-78). CNP Watson opined that Yoho would be absent about three times a month due to his mental health impairments. (Tr. 1679).

#### 4. Administrative Hearing Evidence

Yoho testified at a hearing before the ALJ on February 12, 2025. (Tr. 185-208). He stated that he was 44 years old, 5'11", and weighed approximately 260 pounds. (Tr. 188). He lived with his mother, who would help him with chores such as laundry or cooking; if something was too heavy for him, she would help to lift it. (Tr. 189, 193-94). He was able to drive to his appointments and to the grocery store. (Tr. 189-90). His boyfriend lived over an hour away; he once stayed at his boyfriend's house, but only because he had a doctor's appointment nearby; his boyfriend would generally travel to see Yoho. (Tr. 194-95).

He completed an associate degree from CCBC in 2003. (Tr. 190). He last worked in September 2022, at a hardware store in their cabinet department. (Tr. 190-91). He left that job for medical reasons, was initially on short-term disability, then on long-term disability, and was eventually let go. (Tr. 191). Since that time, he applied for work, including office/clerical and medical office roles, and a bank loan modification position a few months before the hearing. (Tr. 191-92). He testified that he did not take the bank loan modification job because it would have required periodically carrying change trays, and he could not lift anything over 25 pounds. (Tr. 192).

Yoho testified that he could not sit or stand for more than one hour due to retention and swelling in his legs. (Tr. 192). He would have to shift positions or raise his legs above heart level to reduce swelling. (*Id.*). He denied medication side effects. (Tr. 193). He last had physical therapy five months prior. (*Id.*).

Yoho testified that he has a cardiac or lung condition that causes shortness of breath, usually because of exertion on stairs, inclines, or uneven parking lots. (Tr. 196-97). He also had stabbing chest discomfort in the evening, arm numbness, and tingling, and fluid retention of around 20 pounds, for which he takes a diuretic. (*Id.*). He also testified to fatigue requiring two to three daily naps. (Tr. 197-98). He has carpal tunnel syndrome in both hands and wears wrist braces at night, but the braces cause him excruciating pain. (Tr. 198-99). He is right-handed and his right hand was worsening. (Tr. 199). He also reported attending therapy twice weekly. (Tr. 200).

The VE then testified. (Tr. 201). He classified Yoho's past work as general hardware sales, DOT #279.357-050, SVP 4, classified as light, but medium to heavy as performed. (Tr. 202). The ALJ then presented the following hypothetical: assume an individual who is the same age, education, and experience as Yoho, who can perform light work but allows to alternate sitting or standing positions for two minutes at 30-minute intervals without going off task, limited to occasional posturals except no climbing of ladders, ropes, or scaffolds; frequent manipulatives bilaterally, must avoid concentrated exposure to extreme cold and heat, concentrated exposure to wetness and humidity, concentrated exposure to excessive vibration, concentrated exposure to irritants and chemicals, all exposure to unprotected heights, hazardous machinery, and commercial driving; is limited to simple, routine, and repetitive tasks, requiring only simple decisions with no fast-paced production requirements and few workplace changes, must have only occasional interaction with the public, coworkers, and supervisors. (Tr. 203).

The VE identified the following jobs: mailroom clerk, non-postal, DOT #209.687-026, SVP 2, light, with 12,000 jobs in the national economy; routing clerk, DOT #222.687-022, SVP

2, light, with 100,000 jobs in the national economy; and collator operator, DOT #208.685-010, SVP 2, light, with 30,000 jobs in the national economy. (Tr. 203-04).

The VE also testified that more than a day or day and a half absent per month beyond routine leave, or off-task time reduced productivity by 15% or more, would preclude employment. (Tr. 204-05). Upon questioning by Yoho's attorney, when the RFC was reduced to sedentary with bilateral manipulative restrictions limited to occasional, the VE testified there would be no jobs. (Tr. 206).

## IV. The ALJ's Decision

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2028 (7D).

2. The claimant has not engaged in substantial gainful activity since September 30, 2022, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: aortic aneurysm, hypertension, degenerative disc disease of the lumbar and cervical spine, scoliosis, bilateral carpal tunnel syndrome, asthma, COPD, obstructive sleep apnea, diabetes mellitus, obesity, and adjustment disorder with anxiety and depressed mood (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with an allowance to alternate between sitting or standing positions for up to 2 minutes, at thirty-minute intervals without going off task. The claimant can occasionally climb ramps or stairs, balance, stoop, kneel, couch, and crawl, but never climb ladders, ropes, or scaffolds. The claimant can frequently reach, reach overhead, handle and finger. The claimant must avoid concentrated exposure to cold and heat; wetness and humidity; and pulmonary irritants such as fumes, odors, dust, poorly, ventilated areas; and chemicals. The claimant must avoid all exposure to hazards, such as unprotected heights and moving machinery; and commercial driving. The claimant is limited to simple, routine and repetitive tasks, requiring only simple decisions, with

no fast paced production requirements and few workplace changes. The claimant can have occasional interaction with coworkers, supervisors and the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 17, 1980, and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 30, 2022, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 164-77).

## V. Law & Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B. Standard of Review**

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

**VI. Discussion**

Yoho brings one issue for this Court's review: whether the ALJ's findings and conclusions concerning his RFC were supported by substantial evidence. (ECF Doc. 10, p. 12). In short, he argues that the ALJ did not properly consider his maximum RFC, nor his subjective symptom statements under SSR 16-3p. (*Id.* at pp. 12-13). He alleges the ALJ failed to consider or evaluate his allegations of chronic fatigue, shortness of breath, need for naps, or account for his need for breaks and absences due to his symptoms. (*Id.* at pp. 13-17).

The Commissioner states, in contrast, that Yoho's arguments are unpersuasive and has shown no error of law with respect to the ALJ's RFC evaluation. (ECF Doc. 11, pp. 8-14). And

with respect to Yoho's allegations that the ALJ erred in evaluation of his subjective symptom complaints under SSR 16-3p, the ALJ likewise made no error. (*Id.* at pp. 14-18). Rather, the ALJ properly considered the record, cited to evidence in support, and substantial evidence therefore supports the ALJ's RFC determination. (*Id.*). As a result, the ALJ's decision enjoys a 'zone of choice' where it may be left undisturbed by this Court's review. (*Id.* at p. 18 (citing *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 400 (6th Cir. 2018)).

Before proceeding to Step Four of the sequential analysis, the ALJ is required to assess the claimant's RFC. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (1996)). An ALJ must consider all relevant evidence in the case record, including a claimant's severe and non-severe impairments. 20 C.F.R. § 404.1545(a)(2). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a).

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in assessing a claimant's RFC at Step Four. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability."). Generally, an ALJ must explain whether she finds the claimant's subjective complaints consistent with objective medical evidence and other evidence in the record. SSR 16-3p, 2017 WL 5180304, at *10 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain her reasons for discounting subjective complaints). In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate their symptoms, whether any treatment was

effective, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2017 WL 5180304, at *11; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

Here, the ALJ appropriately considered and articulated his findings with respect to Yoho's residual functional capacity. In his decision, the ALJ found that Yoho had the following RFC:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with an allowance to alternate between sitting or standing positions for up to 2 minutes, at thirty-minute intervals without going off task. The claimant can occasionally climb ramps or stairs, balance, stoop, kneel, couch, and crawl, but never climb ladders, ropes, or scaffolds. The claimant can frequently reach, reach overhead, handle and finger. The claimant must avoid concentrated exposure to cold and heat; wetness and humidity; and pulmonary irritants such as fumes, odors, dust, poorly ventilated areas; and chemicals. The claimant must avoid all exposure to hazards, such as unprotected heights and moving machinery; and commercial driving. The claimant is limited to simple, routine and repetitive tasks, requiring only simple decisions, with no fast paced production requirements and few workplace changes. The claimant can have occasional interaction with coworkers, supervisors and the public.

(Tr. 170-71). As the ALJ explained, this RFC was determined in part because Yoho has "normal lever and right ventricular systolic function" despite his heart condition, that chest x-rays have shown he has a normal heart size, and that "examiners have noted the need to monitor the aneurysm annually." (Tr. 172 (internal citations to the record omitted)). The ALJ explained that there was no stress-induced ischemia after stress testing. (*Id.*). Furthermore, Yoho's treating providers "have routinely found he has no edema." (*Id.*).

As to Yoho's lung disease and asthma, the ALJ noted that pulmonary function testing showed only mild obstructive lung disease, with significant response to bronchodilators, and that his providers have stated his condition is stable with prescribed treatments. (*Id.*).

Further, the ALJ discussed that Yoho's degenerative disc disease, back pain, spine tenderness, scoliosis, and limited range of motion on examination were improved by physical therapy and chiropractic care, and that on examination, he had a normal gait. (*Id.*).

The ALJ also noted that Yoho had symptoms of carpal tunnel syndrome, confirmed by examiner findings of decreased sensation in the hands and by EMG. (Tr. 173 (internal citations to the record omitted)). Nonetheless, the ALJ considered and discounted this due to Yoho's hearing testimony that he was able to drive and do crafts despite his carpal tunnel syndrome. (*Id.*).

With respect to his mental health symptoms, the ALJ noted that Yoho reported being in treatment for depression, was seeing a psychiatrist, and was prescribed medications that allowed his depression and anxiety to be "well controlled."

In short, it appears that the ALJ properly considered all of Yoho's impairments when forming the RFC, including his subjective symptoms, and properly formed an RFC with respect to all of his impairments. Yoho's arguments to the contrary result in asking this Court to reweigh

the evidence, which it may not do. Rather, the ALJ enjoys a zone of choice in decision making, and which this Court will not disturb. *See Mullen*, 800 F.2d at 545.

I find no reversible error here. I therefore affirm.

## VII. Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I affirm the Commissioner's final decision denying Yoho's applications for DIB and SSI.

Dated: October 27, 2026

Reuben J. Sheperd
United States Magistrate Judge